Good morning. May it please the Court, my name is Spencer Freeman, I represent Crime Justice & America, with me today at Council Tables is Co-Counsel Savannah Blackwell. I would like to reserve five minutes for rebuttal, if I may. Your Honors, the United States Supreme Court and the Ninth Circuit strongly disfavor the broad, categorical exclusion of publications in prisons, certainly with regard to core protected speech, and when the content of that publication itself is not problematic. This Court's position has been that it's unconstitutional for a prison official to ban the delivery of a publication, simply because an inmate has not- Counsel, I thought your publication was being distributed now electronically through kiosks. It is not. That is an option that was presented essentially beginning- Wait, wait, wait, let me make sure I understand your answer. Are you saying that it is not free kiosks that are installed in the Butte County Jail? I have no idea at this point if it is or is not. Well, isn't that what the Court granted the reopening on Discovery to show, after the close of the evidence? The Court granted the declaration- It was the declaration from the jail commander, right? Correct. From Captain Jones. Captain Jones. Right, and he said that the kiosks are fully operational. What it said was that it did say the kiosks are fully operational, and he did say that Crime, Justice, and America could be uploaded to the kiosks. So are you not supplying them with a PDF so they can load it into the kiosks? Crime, Justice, and America has not supplied them with the- But is Crime, Justice, and America, does it have the ability to do so? It does have the technical ability to do so. It does. For you to say, well, it's not there, that's not really the point. If you have the option of doing it, I think we need to treat this as though you are doing it because you can do it that way. Well, but I think that there's two questions that need to be answered before that. And the first question is whether or not the regulation that we've, as applied to Crime, Justice, and America, that we've asked to be struck down, if there's a rational relationship between the ban and the legitimate penological interest that's being asserted, because that's- Well, the district court held a trial on that issue and made findings of fact and said that unsubscribed, I'll call them commercial papers, pose a risk of fire, clogging, closing windows, blocking windows. I mean, that is now established as fact, counsel. Well, I don't think that it is established as fact. For a couple of reasons- Was it not a factual finding by the district court? I think it was a mixed finding of law and fact. Don't I find it in the findings of fact section of the district court's order? It's technically written underneath that, but it still doesn't change whether or not that there's a rational relationship. I don't understand why you are bobbing and weaving on questions that are clearly established in the record. Well, I don't mean to be- You're losing credibility with me. I can't speak for my two colleagues. I don't mean to be- What kind of a game are you perpetrating this morning? Listen, I'm not trying to perpetrate a game at all. If we go back to this court's order- Well, do you concede that the district court, at the end of the bench trial, found as a fact that these papers constitute a potential threat to the safety and security of the jail? I will agree with you that that is what the district court wrote in the findings of fact. All right. And on appeal, we review that factual finding for clear error, do we not? No, I don't- Is that not the standard of review on a factual finding? That is not the standard of review. And what's your case that establishes that is the standard of review is different from what I just articulated? When you have issues- What's the case? I don't want to hear about issues. I want to hear about a case. Overturn v. Pazetta, which is a United States Supreme Court case in 2006, where that court, the Supreme Court, did their analysis, the entire analysis, including over the factual findings on a de novo review. So when you go back to that case and see how the Supreme Court- I will take a look at that case. Give me the case name again. Overturn v. Pazetta. And the citation name? I don't have it written right here. I can get it to the court. Is it in your brief? It is in the brief, yes. And is that a First Amendment case? I do not at this point recall if it's a First Amendment case. There's different rules for First Amendment cases. I believe it's a First Amendment case, but I don't want to officially say that right here. I don't- and I don't mean to be playing games, but I don't think that it's a de novo review on all of these factual findings, especially when it's a mixed question of law and fact. As you said in Henderson, the application of law and fact requires consideration of legal concepts and involved exercise of judgment about underlying legal principles. When you're going to look at a fact as to whether or not the excess paper is a hazard for security, a hazard for fire, and you're going to talk about whether or not there's a rational relationship between that potential and the stated goal, or the ban and the stated goal, that's a mixed question of law and fact that this court gets to review de novo. And if you go back and you look at this court's ruling in Hurlica v. Reniff, which is in this case, that court, that panel found two things that are really important here that the trial court aired in its findings, both findings and conclusion. And the first one is that this court said that crime justice in America had in fact refuted the common sense connection, which shifted the burden at trial to the sheriff. The district court found otherwise in that, which is in violation of this court's finding and parenthetically violation of the trial court's own summary judgment finding, where it found there also that crime justice in America had refuted the rational connection. So the burden should have shifted at trial, and yet for some reason it didn't. That's an error. The second thing... Wait, wait, wait. Let me stop you there. Yeah. The district court heard testimony from the sheriff's jail command staff about the security problems posed at trial, did he not? He did. So what's wrong with a district court rendering a different factual conclusion after a full trial on the merits as it might compare with what we said on a summary judgment ruling? Under the doctrine of law of the case, there would be nothing wrong if the evidence was substantially different, previously unknown, and undermines the rationale of the Ninth Circuit panel. None of those things... Are you referring to the opinion that I wrote? Hurdlicka v. Reniff. Yeah. I wrote that opinion. Yes, Your Honor. I'm aware. Yes. Of course. That is the law of the case that I'm referring to. Well, the law of the case, as I wrote that opinion, was I'm sending him back for trial. That's true. Which occurred. That's true. But you also stated in that opinion that crime justice in America refuted the common-sense connection. When you go back and look at the transcripts of the trial and everything that occurred at trial, there wasn't any substantially new evidence. There was nothing that undermined your rationale to make that statement in Hurdlicka v. Reniff. So I think the trial court... But Hurdlicka came up on summary judgment. That's fine. But again, when you look at the law of the case and look at the Cain case that we cite in our briefing, that fact alone doesn't matter. Your rationale is still binding on the trial court, unless there's some substantially different evidence that undermines your rationale. And there wasn't anything different at trial. Well, the one thing that's different at trial is that the — as the case came to us at trial, it was the choice between banning paper entirely or admitting paper entirely. If that was still the case, I think you might be okay. But that's not still the case. The choice now is between banning paper and allowing the kiosk, so that to the degree that there's a First Amendment interest in access to the information by the inmates, they appear to have access to it if you would be willing to put it online. Well, so now you're talking about, really, the dividing line between two different interests. Would putting the kiosk... Yes, I am. That's exactly right. And it looks like the First Amendment interest that you have in distributing the information, the First Amendment interest that the inmates have in obtaining the information, is satisfied in a way that it was not previously satisfied, when the only choice was paper distribution. The choice now includes distribution in these online terminals. Oh, and while that may satisfy an inmate's First Amendment right, access to that information, two things. First, I would submit it does not satisfy the publisher's ability to gain access to the inmates that he wants to gain access to through mailing in the publication. Because? Because we — well, first of all, when you look at... Someone who can't use the online thing? Is that what that means? No, that's not the issue. The issue is the evidence developed at trial with regard to the kiosk was extremely minimal. The county didn't put forth a kiosk as an option until literally while we were in trial. And at that time, the software was not working. So there's a lot of unanswered questions as to the actual functionality and the practical aspect of these kiosks. But I thought Captain Jones' post-trial declaration, which the district court admitted when it reopened the evidence, establishes that they are working. But that's all it says. And there's so — all it says, it's a two-line declaration. There's other things. When you go to these jails that have these kiosks, these kiosks are utilized for a multitude of functions. Phone calls, video visitations, requests to medical, purchases from commissary, e-mails. There's all these things. So when you have one kiosk for 18 men — or 18 women, sorry — 18 inmates, the issue comes down to, from a practical standpoint, how much access and how much time access does an inmate really have to the kiosk itself? And that's not even addressing the issue of where is the — where would the Crime, Justice, and America icon be within this — within this kiosk display? Is there something where they have to swipe a page to get to it? Is it prominent and obvious? Is it something that makes it clear that this is information that may be useful and helpful? We don't know any of those things. Your argument is that — I think I read in the record the ratio was one kiosk per 33 inmates. No, I think that's wrong. I think that it's 33 kiosks total with a couple of mobile kiosks, which came down to a ratio of one kiosk for 18 inmates. Eighteen, okay. I think that's right. So your argument is that that's not sufficient for First Amendment access purposes. The ratio has to be lower than that. Is that the argument? No, I don't think that there's some sort of ratio that we can say meets a constitutional standard. I think we've got to look at the totality of the circumstances. The question that would raise in my mind is how would that be different, assuming there were no kiosks? If the newspapers were simply put in, I'll call them common areas, if there are such things in jails. An area that all the inmates would have access to, but not all the inmates would necessarily pick up the paper and look at it. Yeah, and I think that goes to some of the unanswered questions we have about the kiosks. I don't think that there's one set ratio we can talk about. I think that our complaint about these kiosks, as it sits in this record, is that they're just as insufficient information as to how accessible this kiosk is. The district court found that that was a sufficient enough ratio in order to satisfy both the publisher's interest in access and the inmate's interest in accessing the magazine. But that ratio is only a ratio of kiosks to inmates. It's not a ratio of how many people really will have a practical access to this magazine because of the other information that's unknown. And so that is a finding in error in our position. And, Your Honor, I've got three minutes left, so I'd like to stop so that I can have some rebuttal. Thank you. Okay. We'll hear from the other side. Good morning, Your Honors. May it please the Court. John Whiteplate for Defendant Appelli, Sheriff Honey. Thank you, Your Honor. This case is different factually from any other case that has been presented to this court or, frankly, any of the other circuit courts in terms of the justification for the policy. It's based on the safety and security of the inmates and the jail staff. And Appelli is essentially wrong in terms of the standard by which this court must review it. And in terms of there is no clear error ever shown by Appellant in terms of the factual issues. And those factual issues that are key, I think, are in terms of the size of the jail, 580 to 590 inmates, that it's not a direct supervision-type jail. It's actually what they call remote surveillance, direct observation, which was different from what Appellant had presented in terms of evidence of the type of jail that their expert had experience with, which is ultimately why the district court rejected that opinion. The fact that there was testimony by the jail commander, Lieutenant Flicker, about the number of disciplinary problems that were specific to paper-related issues. And I believe the testimony was 5,800 rule violations for a four-year period, 60 percent of those which were paper-related. And to bolster that opinion, excuse me, to bolster that, those statistics, the testimony was, look, we have to replace telephone books every month and throughout the jail. And there are numerous telephone books. And that's because inmates typically rip those pages out, as well as the pages from paperback books and other things, to clog toilets, cover lights, cover windows, make weapons, and another such contraband. And so the rational relationship between the legitimate penological interest here was satisfied, I think is beyond doubt and undisputed factually. Let me ask you a question. It sounds like Mr. Freeman is suggesting that the inmates perhaps are having something in the order of a block of time, let's say, assigned to them. I mean, each inmate might have five minutes, ten minutes, 30 minutes to access the kiosk. I don't know if that's the case, but it sounds like that's what he's arguing. And that the inmate is now faced with the task of deciding how much time he can use to get his food from the commissary, how much he can use to call home and talk to his family. And all of that is in one little block of time. Is that the practical resolution that has occurred here? It is not, Your Honor. And to ensure that the record is clear, there was a point of time where the PDF version of the magazine was on the kiosk because it was, in my understanding, was an IT effort to ensure that it could be put on there. And so it ended up on there as a – and I don't know, frankly, if it's still on there or not. But from the practical aspect in terms of this kiosk, they're in the common areas. And so any time an inmate is in the common area, they have access to them. And that's essentially the limitation is when they have access to the common area. There are certain – And how well developed is the record with respect to – this is kind of a follow-up on Judge White's question – as to what that means in practical terms? I mean, if it's there in theory but not in practice because the inmates are lined up around these kiosks or because the kiosk software is kind of cranky and slow, I mean, what do we know about this? Because it sounds as though this does come in at the last minute. It sounds as though we really don't know a lot about those practical questions. Can you help me on that? Unfortunately, Your Honor, the record is not clear in terms of the practical aspect. And ultimately, what the purpose of the Turner alternatives is, whether something was available for publication, meant that it's available to them. The idea of preserving the penological interest was to reduce paper throughout the jail. And so forms and other things can be available on the kiosk. The practical aspect – But the reason I ask it this way is, for me, speaking – I don't speak for my colleagues, but speaking for myself only, if in fact the access on the kiosks is not realistically access to the publication, I have trouble with this case. On the other hand, if it's realistically available, you win. So what do I know about whether it's realistically available? And I don't believe it's in the record I can present to the court. My understanding is it's just like any other touch screen. It's on the screen. You touch it. It comes up. But I ask a lot of other questions, like how many people are lined up in front of the kiosk, how cranky is the system, and so on. And you're correct, Your Honor, that that is not in the record. Of course, that would depend on the location of the kiosk, whether it's in a particular larger common area within the jail or within, say, a bunk-style room for the inmate. So the practical aspect is going to depend on where it is located within the jail. Why did this show up so late in the trial so that we really – I mean, in a sense, I'm sympathetic with the trial judge. It shows up so late that we're not really in a position to have the trial judge sort of develop the record on the point. That is also not in the record, Your Honor, but I can offer to the court technical difficulties. That's all that basically was. IT problem? Yes. And once they were resolved, and we didn't feel comfortable presenting to the court that it was operational up until the time that we had Captain Jones submit the declaration. And the declaration said, we've resolved them. I'm not sure the exact wording, Your Honor, but it was, in other words, essentially that they're up and operational. Right. And so that was the implication, yes. I thought there was something in the record that the common areas are available from 7 in the morning until 11 p.m. at night. Or, yes, for anything – just like the telephone. So it's anything in the common area is available at any time that the inmates are there. And so that may depend on – so certain areas, depending on where the inmate is located, they may have to rely on, say, the mobile cart and things like that. But that's just like any access to a mobile telephone. So I understand your statement to mean that there are different sized areas in the jail, depending on the inmate's security classification. If he's in the general jail population and he's in a pod, there may be, I don't know, 40 inmates that have access to that common area, depending on cell capacity. And correct, Your Honor, although not necessarily all at once because of safety and security, there may be a rotating schedule in terms of allowing which inmates within the common area or not because of the other safety and security concerns. All that is, frankly, not in the record. And so in the end, the availability of the publication is just about one factor that the district court found in terms of pre-kiosks in favor of appellant as opposed to post-kiosks in favor of the county. And it's essentially all four factors that favor finding that there was no First Amendment violation. Unless there's any further questions, I'll reserve the remaining time for rebuttal. No, you don't get to rebuttal. Okay. I won't then. I mean, this is your shot. All right. The other thing that I'd want just to focus the Court on is that unlike the prison legal news layman where that was individual requests by the inmates, here, appellant is not saying that the individual inmates request this publication. This is the proposed distribution is en masse. Thousands of thousands of pages of publication are anticipated to be flooding the jail. And I want to stress that that's what is the safety and security concern. If there's 10 percent of the inmates receive the publication as appellant would propose every week, that's over 2,000 pages because it's 36 some odd pages of the publication to 58 inmates or so, 2,000 pages per week. So within 10 weeks, there's over 20,000 pages introduced into the jail. And appellant wants to do that recycling every week or every quarter. And if that's every quarter, then I have to correct the record. That's over 80,000, not 100,000, 80,000 pages introduced in the jail. In just one year. That safety and security concern about that huge amount of introduction of paper, which is not your ordinary paper, not your usual cup of paper. It's a higher quality colored paper, presents the huge concern, which is ultimately why in reducing the concern about the paper, the jail looked to reasonable alternatives to try and reduce the other reductions. Basically, that's in the record. We've got that. Yes. With that, I would submit. Okay. Thank you, Your Honor. You've saved about three minutes. Thank you, Your Honor. Thank you. I wanted to address a key point here as we address these kiosks has become such a focal point. We have a period of time before these kiosks were in play. Even if the kiosk resolved this court's concern about the constitutionality of the ban, then we've got that 10-year period before when Crime, Justice, and America first requested to send in a magazine. We're sitting at trial, and the kiosks are at some point shortly after trial operational. We do have that period of time where this court needs to examine the constitutionality of the ban during that time. We would ask this court to make a determination pre-kiosk if the kiosk is going to be that line. And you sought damage as well as injunctive relief? We did seek damage as well as injunctive relief. The record has evidence of damages. The trial court just had no reason to do an analysis on damages when it upheld the constitutionality of the regulation. I do want to point out on the case I cited before with regard to the standard of review, the overturned Bozzetta case. It's a 2003 case that applies the Turner factors. And its citation is 536 U.S. 126. The issue of clear error, if we're going to talk about the kiosks and the finding about the kiosks, the standard for clear error is that it's not plausible in the light of the totality of the record. And our problem with using the kiosks as an issue here is that the record is really void of any evidence about the true functionality of the kiosks. I would also remind this court that the kiosks really goes towards factor number two, about whether or not there's available alternatives for the publisher to reach its intended audience. That's factor number two. In order to get to factor number two, there has to be the factor number one is a sine qua non, without which not. And in that factor, the court's got to make a determination about the rational connection between the ban and the stated interest. And mind you, the counsel came up and just said the stated interest was the reduction of paper. No, the stated interest at trial was the reduction of misuse of paper. You know, that's a distinction without a difference. The objection from the jail has always been inmates have a tendency to misuse paper. The more papers in the jail, the more problems we have. But when you look at this particular record and the testimony from the jail staff in this case, the misuses come from the phone books, they come from the jail library cart books, and they come from toilet paper. The record is clear, and I think that Flicker testified to this, that an inmate's don't use, and in his 26 years he's never seen an inmate use, paper that's considered personal paper, paper that had to be kept within that three-inch stack. And remember here... But doesn't CJA fall into the former category? No, they said that if they, the testimony was that if the inmate wanted to keep the magazine, he was going to have to include it in that three-inch stack. That was going to be a requirement of the jail. No, no, no. What I was asking, I thought that Lieutenant Flicker testified that inmates, for nefarious purposes, don't use the letter from mom. They would use the phone book page, in your case the commercial newspaper page. They would not use something that they were personally identifying with. Well, and that's what our arguments here are, is that we established and set forth evidence that these inmates would personally identify with this magazine, based off its content. They would treat it like a letter from mom. They would treat it more, probably more like, I don't want to say a letter from mom, because I don't know the relationship, but probably more like... Isn't that what he, I mean, he did draw a distinction between papers, for example, their legal papers that they, would be important to them. Right. As opposed to something torn out of the magazine or a newspaper. Well, if I can address that, I think that, let's say they ordered Sports Illustrated, and we're getting Sports Illustrated into there. That Sports Illustrated would be part of their three-inch stack. They identified with the Sports Illustrated. I think our evidence shows that crime justice in America is going to be akin to that Sports Illustrated. But all that does is it gets the paper in the cell. Then the question becomes, what do they do with it? And I thought I read in the record that his testimony was that if they're going to use it for bad purposes, they're going to grab that rather than the letter from mom. Isn't that what the testimony showed? No, I don't think so. I think that the record was clear in my memory that anything in that three-inch stack they've never seen used for the improper purposes. It was these other things that was used. All right. Thank you. Thank both sides for your arguments. The case of crime justice in America v. Henea now submitted for decision. The last case on our argument calendar this morning, protecting Arizona's resources and children and Gila River Indian community v. Federal Highway Administration et al.
judges: W. Fletcher, Tallman, Hoyt